## Case No. 15,741.

### UNITED STATES v. The MATILDA.

[Brunner, Col. Cas. 258; [1] 5 Hughes, 44; 4 Hall, Law J. 478.]

Circuit Court, D. North Carolina. May Term, 1813.

#### EQUITY RULES IN ADMIRALTY COURTS.

The equity rule requiring two witnesses, or one witness and corroborating circumstances, to overcome the denial in the answer, is not recognized in admiralty courts.

[Cited in Hutson v. Jordan, Case No. 6,959.]

This was a libel in the admiralty, seeking the condemnation of the Matilda and her cargo as lawful prize; and was filed and heard in the district court at Wilmington, at May term, 1813. The libel charges among other things that the schooner Matilda, being a vessel of the United States and belonging to citizens thereof, did depart from the port of Newbern since the 11th of March last, with a cargo of shingles, scantling, and corn, bound for some British port in the West Indies, to wit, some port in Antigua, Montserat, St. Christophers, Nevis, or the Virgin Islands, with an intention on the part of the master and owners of disposing of the cargo to the inhabitants (being British subjects) of some of said islands. That on the 5th of April, 1813 (the day of capture), in lat. 26 deg. 39 min. north, long. 68 deg. 17 min. west, the Matilda was sailing under a British license which authorized the importation of said cargo from the United States into the said British islands. A claim and answer was put in by Thomas Jenkins, the master, and one third owner of the schooner and cargo, and by Moses Jarvis, for himself and his partner Sylvester Brown, owners of the other two thirds, all citizens of the United States. They state among other things, that the schooner and cargo were seized about the 5th of April, 1813, by the Gen. Armstrong, on the high seas, while said schooner was proceeding from the port of Newbern, North Carolina, to the Island of St. Bartholomews, in the West Indies; that she was regularly cleared for said voyage; that they, the claimants, had given bond, according to law, that she should not proceed to an enemy's port; that she was at the time of seizure, in the direct course to St. Bartholomews; that they, the claimants, had no intention of proceeding to an enemy's port; or of having any commercial intercourse with the enemies of their country; that said claimants had coffee lying at St. Bartholomews, which they were desirous to bring home, and which partly induced the prosecution of said voyage; that the schooner was boarded and taken by the crew of the ship, and the master, Thomas Jenkins, ordered on board the ship, the said crew being in possession at that time of no other papers from the Matilda, as claimants know of, than the regular documents of the vessel and a letter

---

from Jarvis and Brown to Jenkins; that on the 5th day after the capture, two men opened Jenkins's trunk, and having searched his pocket-book, found therein two papers, commonly known as British licenses, which were procured by Jarvis and Brown, from American citizens, and were intended to protect the Matilda from British cruisers on her said voyage to St. Bartholomews; that at the time of capture, the seamen of the General Armstrong were in a state of revolt, mutiny and rebellion, the captain of said ship being confined to his cabin and his authority usurped —and they submit whether a capture thus made can be good prize. To this claim and answer, is annexed the affidavit of the claimants Jarvis and Jenkins, declaring the facts to be true.

The evidence was in substance as follows: A license signed by H. Elliott, governor of the British leeward Charibee Islands, at Antigua, the 22d of January, 1813, to be in force from the date thereof to the 30th of June next. This license expresses to be issued by virtue of an order in council, of October 26th, 1812. It is granted to Daniel Multhrope, and permits a vessel being unarmed and not less than one hundred tons burthen, and bearing any flag except that of France, &c. to import into any of the ports of Antigua, Montserat, St. Christophers, Nevis, and the Virgin Islands, from any port of the United States, a cargo of staves and lumber, live stock etc., and every kind of provisions whatsoever, beef, pork, butter, salted, dried and pickled fish excepted, without molestation, on account of hostilities existing between his majesty and the United States, notwithstanding the said ship and cargo may be the property of any citizen or inhabitant of said states, etc., and that the master of said vessel shall be permitted to receive his freight and return with his vessel and crew to any port of the United States not blockaded, with a cargo consisting of rum and molasses, and of any other goods and commodities whatsoever, except sugar, indigo, cotton, wool, coffee and cocoa; upon condition that the name and tonnage of the vessel, and the name of the master shall be indorsed on the license at the time of the vessel's clearance from the port of landing. This license was indorsed in the following words by the claimant Jarvis, viz., "Thomas Jenkins, master of the schooner Matilda, burthen 114 82/95 tons, with a cargo of scantling, shingles, corn, and necessary stores, Newbern, North Carolina, March 11th, 1813." Another license, agreeing in all respects with the last mentioned, except that this gives permission, in addition to the former, to touch at St. Bartholomews on the outward and homeward voyage to and from the British Islands. This is not indorsed, but both bear No. 46, and are intended probably as a set of licenses. A letter from Jarvis and Brown, written at Newbern, March 11th, 1813, addressed to Thomas Jenkins at Wallace's Channel, states, that since writing the letter which

covers the bills of lading, the mail brought the news of the adjournment of congress, and that the senate had put a death wound on the license bill, and the bill to prohibit the neutral trade was also killed by the same house, so that we are now in the same situation with respect to commerce as we were before the session commenced. As the non-importation law is still in force, should you think of returning with produce, you will guard against your own government. The Matilda had a regular clearance from Newbern, bound for St. Bartholomews, dated 11th March, 1813. The bill of lading at Newbern, written by said Jarvis, agrees with the cargo before stated, and bears even date with the clearance; but in the bill of lading the vessel is said to be "bound for the West Indies." The list of seamen was regular, and so was the register. The president's commission to the General Armstrong is in the usual form, and of date, the 23d November, 1812. The ship is therein stated to belong to John Everingham and John Sinclair; and authority is given to John Sinclair, captain, and David Pearce, lieutenant, of said ship, and the officers and crew thereof, to subdue and take any British vessels, etc., and the said John Sinclair is further authorized to detain, seize and take all vessels and effects, to whomsoever belonging, which shall be liable according to the law of nations and the rights of the United States as a power at war, and to bring the same into some port of the United States, in order that due proceedings may be had thereon.

William Livingston, a witness for the libellants, swore, that on the 5th of April last, the Matilda was brought to by the General Armstrong; that Jenkins was ordered on board the ship, and his papers demanded; upon which he delivered the register, clearance, bill of lading, and list of seamen aforesaid—that he, the witness, being then sailing master of the ship, declared he would send the schooner into port; to which Jenkins replied, that he had not seen all his papers, and pulling two more out of his pocket gave them to this witness, which proved to be the indorsed license, and the letter from Jarvis and Brown to Jenkins as aforesaid—that a few days after he searched Jenkins's trunk, and found therein the indorsed license aforesaid—and that he commanded the ship at the time of said seizure. Upon his cross-examination, he declared that Captain Sinclair was confined to his cabin by some part of the crew as he understood; that it is not common for the sailing-master to have command of the ship, when the captain is on board—that Sinclair, Everingham, and others, were owners of the ship—that Captain Sinclair authorized him to act as sailing-master—that Sinclair did not seize, or assent to the seizure of the Matilda. James Johnston, another witness for the libellants, deposed that the General Armstrong arrived at the port of Wilmington on the 16th of April, and the Matilda on the 19th—that

Captain Sinclair put him on board the Matilda, in the port of Wilmington, to take an inventory of the effects, and to dispossess the mutineers—that he was first lieutenant of the ship, and held possession of the schooner under the authority of Captain Sinclair—and upon his cross-examination said, at the time of the capture, Captain Sinclair was confined in his cabin, and that he, the witness, was confined in the ward-room with liberty to go on deck, but to have no communication with the crew—when Jenkins came on board, he, the witness, was ordered out of the ward-room on the forecastle, by William Livingston, sailing-master, and then commander, but was not to communicate to Jenkins the state the ship was then in—that on the 18th March, while the captain and he were together in the cabin, the doors were shut on them, and they confined by the master's mate and others of the crew—he saw Jenkins's trunk after it was open, heard that they had gotten another license, but did not see it. Charles A. Lewis, also sworn on behalf of the libellants, declares that at the time the Matilda was brought to, the General Armstrong was under British colors—he was in the ward-room of the ship when Jenkins came on board—heard Livingston ask him for his papers—saw Jenkins deliver some papers to Livingston—and upon the threat of the latter to send the schooner into port, Jenkins seemed confused, and said "I have more papers that you have not seen," and took out of his pocket and delivered to Livingston the indorsed license and the letter aforesaid. Captain John Sinclair, a witness for the claimants, deposed, that on the 18th March, he was dispossessed of the command of the ship by William Livingston and other officers and crew—that Livingston, who was then under arrest for misdemeanor, took the command of the ship the same night, without authority from him, and continued in command until after the capture—and that the capture was made without his privity or consent; he was the commander and part owner of the ship; he delegated power to Everingham to do in the subject of the capture as he might think proper, as agent for the owners, and the said agent has carried on the proceedings —that he would not from his knowledge of the general character of Livingston, believe him on oath—he appointed Livingston sailing-master when he first came on board, and continued him in that command until the 22d February, when he arrested him for disobedience of orders—that he put an officer on board the Matilda to divest those of the command who had captured her without his privity or consent, and to keep possession of her on account of the ship, until it should be determined to whom she might of right appertain. The two licenses and the letter were delivered to the collector of the port of Wilmington, previous to the arrival of the Matilda.

Upon this evidence it was argued for the libellants, that the overt act of sailing under a British license was evidence of trading with the enemy according to the tenor of the license; and that the trading with the enemy was an act, for which, by national law, the vessel and cargo so taken in delicto were confiscable, and Vattel was relied upon as furnishing the rule of decision in cases of such trading. It was further contended, that the law of nations, prohibiting intercourse and dealing with an enemy, is not abrogated by the act of congress on the subject of licenses, as was decided in Pennsylvania by Judge Peters, in the case of The Tulip [unreported].

For the claimants it was argued, that there has been no act committed; no trading with the enemy, nor any other act violating the rules of general public law: for at most, the evidence proves nothing more than an intention to proceed to an enemy's port; and it is contrary to every principle of law and justice to punish a man for his imaginations. The Matilda was in the road to St. Bartholomews, and had not so much deviated from her course, so as to lay the foundation for the inference that her real destination was an enemy's port. Term R. 85; Park, Ins. 114. But it was not, in fact, the intention of Jenkins to proceed to a British port—his real destination was St. Bartholomews, as declared by the claimants on oath. No evidence has been adduced to repel this positive declaration, except the feeble presumption arising from the mere possession of the license; which is completely answered by the rule, that every man is presumed to be innocent until the contrary appear. It was also contended, that the mutiny of the crew disabled them from making lawful capture, and rendered them obnoxious to a law which affixes the punishment of death to such an offense, and as the commissioned officers were divested of their command by force and wrong, their assent to the capture could not be presumed; nay the contrary was expressly proved.

The argument being closed, and the object of counsel having been stated to be that of obtaining an immediate decision of this court, and of taking the case thence by appeal to the circuit court, so as to have a hearing at the ensuing term, the judge proceeded to deliver his opinion. He remarked on the novelty and importance of the question—that it was important not only as to the amount of property at stake, but was of vast importance in principle and consequences. He glanced at the difficulties he felt in deciding some of the points in the cause without the aid of authorities or of time to reflect. For these reasons he approached the case not without some distrust of his own judgment; but he felt much relief from the assurance that the case would undergo an investigation in a superior tribunal; for this reason he thought it not very material how he should decide. He felt it his duty, however, as the case had been argued, to meet the question, and briefly to

state the reasons which occurred at the moment to influence his decision. As to the objection that the act of trading was not complete, he had no hesitation in saying that, according to the current of decisions, particularly in cases of blockade, where the principle is the same, the offense was complete, if the real destination was an enemy port; for this is not the case of a mere will or intention to proceed to such port, which, without some overt act would not be punishable; but there was an actual sailing and proceeding on the voyage, thereby carrying that intention into effect; and the point at which the vessel was arrested, affords no grounds unfavorable to the presumption that she was bound to one of the British licensed ports; because she was in the road as direct for one of those as for the neutral port. The question of fact then is this: Was the Matilda really bound to a British port with a cargo? The judge felt himself bound by the evidence to say that she was; according to the well known rules in the court of admiralty, that where a suspicion of guilt is created by the possession of documents, it is expected that the possessor will explain away such suspicion by proof; and where such suspicion is applicable to the charge in the libel, it is prima facie evidence of the facts contained in the allegation, and casts the burden of proof on the party charged. Now, he remarked, the possession of the licenses and the letter of advice, unexplained by evidence, is proof to my mind that the vessel was prosecuting the voyage she was permitted to do by the license. It is true the American papers were all regular, and so they must have been to obtain a clearance. Nothing should be inferred from thence, because every man, whether his designs be honest or otherwise, would use the same precaution; and no man would furnish evidence against himself in a way not at all necessary to the execution of his unlawful designs. The British cruisers know that vessels of the United States must conform to our municipal regulations ere they are permitted to depart. As to the letter, it bears evidence of some unlawful purpose—for if the real object was a lawful trade, it is difficult to assign a reason for the additional caution, "guard against your own government." The captain was already apprised of the failure of the license bill, and of the existence of the non-importation act. The object, indeed, might be to import British produce from a neutral port—which, though unlawful, does not fall under the present charge; or, it might be to import from a British port, and to touch at St. Bartholomews, and there obtain a neutral clearance, so as to guard against this government. The latter supposition very well accords with the licenses. Upon the question of law, whether the act of congress of the 6th of July last, upon the subject now under consideration, is cumulative on the prohibitions of international law, or whether it operates as a repeal or abrogation of those prohibitions; the judge expressed much doubt, but yielded to the opinion which had been given by Judge Peters in the case of The Tulip, that the act of congress is but cumulative.

The only remaining point to be noticed, said the judge, is one of great importance, and, to the court, of serious difficulty; because I entertain much doubt on it, and have not the aid of books in forming my opinion; it is the question which grows out of the mutiny of the crew of the privateer. From what has been said, it would seem that the schooner and her cargo are confiscable; but it does not necessarily follow that because the property is forfeitable to the United States, the libellants shall take the benefit of such forfeiture. The president's commission was the authority under which the capture was made; this commission authorizes John Sinclair the captain, to seize, etc., but the evidence is that the captain, at the time of capture, was, by the violence of the crew, put in close confinement and deprived of all command and authority over the ship. As, therefore, the authority was usurped by others, and the vessel navigated against the will of the captain, all acts done by the crew during such usurpation must be presumed to have been done against his will; or, at any rate, not with his assent either express or implied. The libel is filed in the name of the United States for the use of the owners, officers and crew of the ship. Had it been in the name of the crew only, according to the truth of the case, the objection then would have been, that you have departed from the commission, which was their authority to seize. And taking the case as it stands, it appears a little awkward for the United States to sanction an act that necessarily springs from another which they have said, by the legislature, shall be punished with death. The crew in a state of mutiny made the capture: mutiny is punished with death. And is it competent for the captain to contradict the fact, and now allege that he made the capture, or that it was made by his assent? Or shall he now give a right to himself by relation, and make valid that which was unlawful at the time? The court inclines to a negative answer. What vests the right in the captors? Surely the prize-act—and there it will be seen the right is vested in the owners, officers and crew of the vessel by whom the capture is made.

Upon this point, THE COURT adjudged that the evidence did not support the allegation, and therefore dismissed the libel; but did not decree the restoration of the property. An appeal was immediately obtained and the case brought up to the circuit court at this place, where it was argued at considerable length, at the last term, before the chief justice of the United States, and two points were made, 1st. Was the Matilda bound to an enemy port? 2d. Did the conduct of the crew of the ship affect the right of the

libellants in the present proceeding? It was conceded that if the Matilda was really bound to a British port, the offense was complete. But it was contended that there was no evidence of such fact, except a vague inference to be deduced from the mere possession of the license; for as to the witnesses, it was said, they were interested in the distribution of prize, and therefore incompetent. 4 C. Rob. Adm. 68; 5 C. Rob. Adm. 307. That the presumption such as it was, in favor of the libellants, was answered by the positive oath of Captain Jenkins, who was a competent witness; and that the licenses were intended as a fraud upon the enemy; a practice which is always permitted.

Upon the second point the counsel for the claimants relied upon 2 Ruth. Inst. 564; 3 C. Rob. Adm. 160–184; Marten's 2 Azunia, 354–362; and Browne, Civ. & Adm. Law, 461.

The counsel for the libellants took a survey of the evidence, and endeavored to show by fair inference the unlawful purpose of the claimants. He admitted that the claim and answer as sworn to by Captain Jenkins should be taken as though the captain had been examined on interrogatories. Upon the second point he introduced and relied upon as conclusive authorities, Browne, Civ. & Adm. Law, 281, 282, 453, and 8 Term R. 224.

The Chief Justice asked if Captain Jenkins was a competent witness, and being answered by the libellant's counsel that he was, he was clearly of opinion that the charge against the schooner had no foundation. He remarked upon the regularity of the ordinary papers —he thought the letter of advice contained no evidence of criminal intent, but rather the contrary. He stated the question to be, whether the claimants intended a voyage to an enemy port or not. But he saw no evidence of such intention, save that of the license: that it was common and not at all improper to carry papers to deceive the enemy; that the carrying of the license was to enable them to prosecute a voyage to a neutral port under the protection of the license; and that the evidence of Captain Jenkins cleared the case of all doubt by stating the real object, and positively denying the inference drawn from the license. Here the libellants' counsel called the attention of the Chief Justice to the fact, that Jenkins was part owner of the schooner and her cargo, a circumstance not recollected when the concession was made. The Chief Justice immediately replied that he was interested and of course incompetent. The counsel for the claimants then argued, that this answer should be received as an answer in chancery is; and if so, the answer is to be taken as true until it be disproved. The Chief Justice admitted the rule in the court of chancery, as to the negative matter of an answer, but not in a case where it asserts a right affirmatively in opposition to the complainant's demand; but he took this distinction between a case in chancery and a case in admiralty: in the former, the complainant

calls upon the defendant to purge his conscience and disclose facts; and by this appeal to his conscience the complainant makes the answer evidence: in the latter case no such demand or appeal is made.

The Chief Justice then said that the case was very different from what he conceived of it under the evidence of Jenkins; and expressed a willingness to let it lie over for further proof if the libellants had a prospect of obtaining any; but being told they had not, he said he was still of the same opinion; and affirmed the decree of the district court. He also decreed the restoration of the property, but without damages. He gave no opinion upon the second point.

Effect of equity rules in admiralty courts. See Hutson v. Jordan [Case No. 6,959], approving case in text.